# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit
**FILED**
March 21, 2022
Lyle W. Cayce
Clerk

No. 21-60130

Ray C. Turnage, *on behalf of themselves and all others similarly situated*; Reverend D. Franklin Browne, *on behalf of themselves and all others similarly situated*; Dennis D. Henderson, *on behalf of themselves and all others similarly situated*; Carlos Wilson, *on behalf of themselves and all others similarly situated*; Fred Burns, *on behalf of themselves and all others similarly situated*; Charles Bartley, *on behalf of themselves and all others similarly situated*; Clarence Magee, *on behalf of themselves and all others similarly situated*; Linda Patrick-Crafton, *on behalf of themselves and all others similarly situated*; Barbara Young, *on behalf of themselves and all others similarly situated*; Juanita J. Griggs, *on behalf of themselves and all others similarly situated*; Chernise Seaphus, *on behalf of themselves and all others similarly situated*; Mount Carmel Baptist Church; Pinebelt Community Services, Incorporated; Hall-Fairley Mortuary; Deborah Delgado,

*Plaintiffs—Appellants*,

versus

Sam Britton, *Mississippi Public Service Commissioner*; Cecil Brown, *Mississippi Public Service Commissioner*; Brandon Presley, *Mississippi Public Service Commissioner*; Mississippi Power Company,

*Defendants—Appellees*.

Appeal from the United States District Court
for the Southern District of Mississippi
USDC No. 3-18-CV-818

Before DENNIS, HIGGINSON, and COSTA, *Circuit Judges*.

GREGG COSTA, *Circuit Judge*:

In 2015, the Supreme Court of Mississippi ordered an electric utility to refund the money it had collected from customers under a faulty rate order. In this federal sequel to that state-court lawsuit, ratepayers contend that an erroneous calculation of the interest on their refunds shorted them millions of dollars in the aggregate.

This appeal raises two jurisdictional questions and one merits question. We agree with the district court that sovereign immunity bars the ratepayers' claims against the Mississippi Public Service Commissioners. We also agree that the Johnson Act does not preclude federal jurisdiction over the claims against the utility. On the merits, however, we disagree with the accrual date the district court used in dismissing the case on limitations grounds.

I.

This dispute traces back to a rate increase the Mississippi Public Service Commission approved almost a decade ago. To allow Mississippi Power Company[1] to raise more than $330 million to construct a power plant in Kemper County, the Commission authorized the utility to increase its rates by 15% in 2013 and an additional 3% in 2014.

The Supreme Court of Mississippi invalidated the rate increase. In addition to finding that the Commission exceeded its authority in blessing the rate hike, it concluded that the Commission and Mississippi Power violated ratepayers' due process rights. *Miss. Power Co., Inc. v. Miss. Pub. Serv.*

---

[1] Mississippi Power provides electricity to roughly 188,000 customers in southeastern Mississippi.

*Comm'n*, 168 So. 3d 905, 912, 916 (Miss. 2015).  The supreme court ordered Mississippi Power to refund the unauthorized charges.  *Id.* at 916.

Under state law, the utility was required to refund the excess to customers "in full, including interest at the lawful rate."  MISS. CODE ANN. § 77-3-39(12).  Mississippi's lawful interest rate is "eight percent (8%) per annum, calculated according to the actuarial method."  *Id.* § 75-17-1(1).

Mississippi Power submitted a proposed refund plan to the Commission on July 21, 2015, which the Commission approved on August 6th.

Mississippi Power began issuing refund checks on November 6, 2015 and mailed out the final batch of checks on December 4, 2015.  Ratepayers who did not elect to receive a refund check received a credit on their utility bill instead.  The refund program formally ended on May 27, 2016, when an independent auditor confirmed that all refunds had been distributed or were otherwise accounted for.

At some point before the checks issued, some ratepayers commissioned economist Mark A. Cohen to compare the interest they would receive under the refund plan to the interest guaranteed by statute.  On August 13, 2016, Cohen informed them that he believed that Mississippi Power had shorted them more than ten million dollars.  Although the plan purports to use an interest rate higher than the statutory 8%, Cohen contends that the plaintiffs received less than they were owed using either rate.  This discrepancy may be due to how the refund plan compounded interest.

On November 21, 2018, more than two years after receiving Cohen's report, individual and institutional electricity customers filed a putative class action against Mississippi Power and the three Mississippi Public Service Commissioners in their official capacities.  The ratepayers brought claims

No. 21-60130

under state law, as well as section 1983 claims under the Due Process Clause and the Takings Clause.

The district court dismissed the claims against the Commissioners and Mississippi Power in separate orders. It first held that sovereign immunity barred the ratepayers' claims against the Commissioners. In a second order, the district court determined that the Johnson Act, 28 U.S.C. § 1342, did not deprive it of subject matter jurisdiction over the remaining federal claims but then dismissed the federal claims against Mississippi Power as time-barred. Finally, the court declined to exercise supplemental jurisdiction over the remaining state law claims based on the Class Action Fairness Act's home state exception and dismissed them without prejudice. The ratepayers timely appeal all of these rulings except the without-prejudice dismissal of the state law claims.

## II.

As we must, we first address the jurisdictional issues. *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001).

### A.

Recognizing "the problems of federalism inherent in making one sovereign appear against its will in the courts of the other," the Eleventh Amendment and general principles of sovereign immunity prohibit federal courts from hearing certain lawsuits against the states. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984) (quoting *Emps. v. Miss. Pub. Health & Welfare Dep't*, 411 U.S. 279, 294 (1973) (Marshall, J., concurring)); *see also Allen v. Cooper*, 140 S. Ct. 994, 1000 (2020) (recognizing that although the text of Eleventh Amendment "applies only if the plaintiff is not a citizen of the defendant State," the amendment reflects a broader immunity principle inherent in the federal system). Commissioners Bailey, Maxwell, and Presley invoke this sovereign immunity.

No. 21-60130

Although sovereign immunity bars most suits against states and their agencies in federal court, it is not absolute. *City of Austin v. Paxton*, 943 F.3d 993, 997 (5th Cir. 2019). It does not apply when the state consents to suit or when Congress abrogates the state's immunity. *Id*. Additionally, under *Ex parte Young*, 209 U.S. 123 (1908), sovereign immunity does not bar suits against state officers for prospective declaratory or injunctive relief because officers act as private persons "stripped of [their] official clothing" when they violate federal law. *K.P. v. LeBlanc*, 627 F.3d 115, 124 (5th Cir. 2010). Congress has not abrogated the states' immunity from section 1983 claims and Mississippi has not consented to suit, so federal jurisdiction over the Commissioners turns on *Young*.

The *Young* exception to state sovereign immunity applies when the party invoking it establishes three criteria. First, the complaint "must name individual state officials as defendants in their official capacities." *Raj v. La. State Univ.*, 714 F.3d 322, 328 (5th Cir. 2013). Second, the complaint must allege an ongoing violation of federal law. *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002). And finally, the complaint must seek prospective relief. *Id*.

The complaint easily satisfies *Young*'s first requirement. The Public Service Commissioners are state officials ordinarily shielded by sovereign immunity. *Gulf Park Water Co., Inc. v. Miss. Dep't of Env'tl Quality*, 59 F.3d 1241, 1241, 1995 WL 413105 (5th Cir. 1995) (unpublished). And they are sued in their official capacities.

The ratepayers stumble at *Young*'s second requirement. *Young* does not apply when the injurious conduct occurred "at one time or over a period of time in the past." *Corn v. Miss. Dep't of Pub. Safety*, 954 F.3d 268, 275 (5th Cir. 2020) (citing *Papasan v. Allain*, 478 U.S. 265, 278 (1986)). When there is no ongoing violation of federal law, *Young* jurisdiction is not needed to

5

Case: 21-60130     Document: 00516348141     Page: 6     Date Filed: 06/08/2022
Case 3:18-cv-00008-CWR-FKB   Document 76   Filed 06/12/22   Page 6 of 18

No. 21-60130

prevent state officials from "employ[ing] the Eleventh Amendment as a means of avoiding compliance with federal law." *P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 146 (1993).

The conduct that the ratepayers complain of is not ongoing. They argue that "enforcement of the Kemper Refund Plan and its improper [interest calculation method]" deprives them of their rights under the Takings and Due Process Clauses. But as the district court correctly pointed out, neither the Commission nor Mississippi Power have taken any action to administer or enforce the refund plan in years. Mississippi Power issued the final batch of refund checks to customers in December 2015 and the refund program formally ended after the May 2016 audit. Just last year, we found no continuing illegality when the investigation and administrative proceedings "forming the basis of the allegations . . . [we]re completed." *Spec's Fam. Partners, Ltd. v. Nettles*, 972 F.3d 671, 681 (5th Cir. 2020). Likewise here, the relief sought "focuses on past behavior"—the conduct of government officials during a now-concluded adjudicatory process. *Id.*

*Young* requires the ratepayers to "allege that the defendant *is violating* federal law, not simply that the defendant has done so." *NiGen Biotech, L.L.C. v. Paxton*, 804 F.3d 389, 394 (5th Cir. 2015). Because the ratepayers failed to identify an ongoing violation of federal law, the district court properly dismissed the claims against the Commissioners for lack of jurisdiction.[2]

---

[2] The district court also held that any relief would be retrospective, contrary to *Young*'s third requirement. We do not need to reach this issue because *Young* jurisdiction fails for lack of an ongoing violation of federal law.

B.

Mississippi Power also challenges federal jurisdiction. The utility contends that the Johnson Act, 28 U.S.C. § 1342, makes state court the only proper forum for this suit.

1.

The Johnson Act divests federal courts of subject matter jurisdiction over certain disputes involving state rate orders. It states that district courts may not "enjoin, suspend or restrain . . . any order affecting rates chargeable by a public utility" when four criteria are met:

> (1) Jurisdiction is based solely on diversity of citizenship or repugnance of the order to the Federal Constitution; and,
>
> (2) The order does not interfere with interstate commerce; and,
>
> (3) The order has been made after reasonable notice and hearing; and,
>
> (4) A plain, speedy and efficient remedy may be had in the courts of such State.

28 U.S.C. § 1342.

The Johnson Act resulted from early twentieth century tension over federal court intervention in state rate regulation. Supreme Court decisions like *Ex parte Young*, 209 U.S. 123 (1908), and *Home Telephone & Telegraph Co. v. City of Los Angeles*, 227 U.S. 278 (1913), had expanded the ability of federal courts to intervene in the work of state agencies. Clinton A. Vince & John S. Moot, *Energy Federalism*, 42 ADMIN. L. REV. 323, 358 (1990). Regulated industries used this new-found federal jurisdiction to challenge state regulatory actions in federal court. *Id.* Some utilities so desired federal jurisdiction to challenge state ratemaking that they changed their state of incorporation to manufacture diversity jurisdiction. 78 CONG. REC. 2031 (1934) (statement of Sen. Norris) (describing how a Nebraska utility

Case: 21-60130      Document: 00516348141      Page: 8      Date Filed: 06/08/2022
Case 3:18-cv-00866-CWR-FKB   Document 76   Filed 06/12/22   Page 8 of 18

No. 21-60130

reincorporated in Maine, where it did not have any business, to create diversity jurisdiction to sue Nebraska regulators).

A backlash ensued against federal courts' issuance of rate injunctions. *See* Edward A. Purcell, Jr., BRANDEIS AND THE PROGRESSIVE CONSTITUTION 23–26 (2000). Progressives believed that "federal jurisdiction enabled companies to delay and often defeat administrative orders regardless of the merits involved." *Id*. at 24 (quoting New York Mayor Fiorello LaGuardia's comments that these lawsuits were a "flagrant misuse of the Federal courts" and "used for the purpose of legalizing the exploitation of these greedy corporations"); 78 CONG. REC. 8335 (1934) (statement of Sen. Johnson) (worrying that public utilities sued in federal court not in search of a neutral forum for legitimate claims, but instead "to delay, hinder, and impede the states in their regulatory actions"). States-rights advocates lamented federal intrusion into the states' traditional ratemaking prerogative. Purcell, *supra*, at 24–26; 78 CONG. REC. at 8324 (statement of Rep. Mapes) (states should be able to "perform their proper functions in the supervision and fixing of rates, without interference of Federal law.").

Progressives and advocates for states' rights united in 1934 to pass the Johnson Act, *see* Purcell, *supra*, at 26, which took the extraordinary step of restricting federal jurisdiction, *see Burford v. Sun Oil*, 319 U.S. 315, 337 (1943) (Frankfurter, J., dissenting) ("Aside from the Johnson Act . . . the many powerful and persistent legislative efforts to abolish or restrict diversity jurisdiction have ever since the Civil War been rejected by Congress."). The Act aimed to "channel normal rate litigation into the state courts." *Gulf Water Benefaction Co. v. Pub. Util. Comm'n*, 674 F.2d 462, 468 (5th Cir. 1982); *see also Tennyson v. Gas Serv. Co.*, 506 F.2d 1135, 1138 (10th Cir. 1974) (explaining that the Act "was intended to keep constitutional challenges to orders affecting rates out of the federal courts 'lock, stock, and barrel.'").

Case: 21-60130    Document: 00516348141    Page: 9    Date Filed: 06/08/2022
Case 3:18-cv-00008-KHJ-FKB   Document 76   Filed 06/22/22   Page 9 of 18

No. 21-60130

Congress largely succeeded. Today, courts routinely deny federal jurisdiction over utilities' constitutional challenges to state and local regulators' rejection of rate hikes. *See, e.g.*, *People's Nat'l Util. Co. v. City of Houston*, 837 F.2d 1366, 1367–68 (5th Cir. 1988) (applying the Johnson Act to utility's claim that city's failure to approve its request for a rate increase constituted an uncompensated taking); *U.S. West, Inc. v. Tristani*, 182 F.3d 1202, 1206, 1211 (10th Cir. 1999) (applying the Johnson Act to utility's claim that state's consideration of subsidiary's advertising revenue in rate calculation violated the utility's freedom of expression and constituted an uncompensated taking).[3] With this foundation in mind, we address whether the Johnson Act bars federal jurisdiction over this class action.

2.

This case comes to us in a posture that the Johnson Act's supporters may not have foreseen. Instead of the utility seeking a federal forum, it is the ratepayers who prefer to have this suit in federal court. Despite this oddity, we proceed to apply the Act as written.

The Johnson Act deprives a federal court of jurisdiction over challenges to "order[s] affecting rates" only when all four of its conditions are met.[4] 28 U.S.C. § 1342. As the party arguing that the Act displaces

---

[3] Preemption claims are the exception. In the 1980s, several courts held the Johnson Act inapplicable to preemption cases because preemption is not "solely" based on claims of unconstitutionality but on a combination of the Supremacy Clause and federal statutory law. Vince & Moot, *supra*, at 359–60. *New Orleans Pub. Serv., Inc. v. City of New Orleans* is typical. 782 F.2d 1236, 1242 (5th Cir. 1986), *withdrawn in part*, 798 F.2d 858 (5th Cir. 1986).

[4] As a threshold matter, ratepayers briefly argue that the Johnson Act is inapplicable before even reaching the four factors because their suit does not involve an "order affecting rates." The 2015 refund order impacts rates because the amount ratepayers ultimately paid for service in 2013 and 2014 "would necessarily be less as a result of the order." *Hill v. Kan. Gas Serv. Co.*, 323 F.3d 858, 864 (10th Cir. 2003).

Case 3:18-cv-00008-CWR-FKB   Document 76   Filed 06/09/22   Page 10 of 22

No. 21-60130

federal question jurisdiction that otherwise exists, Mississippi Power bears the burden of proving the Act's elements. *Williams v. Pro. Transp., Inc.*, 294 F.3d 607, 612 (4th Cir. 2002). The ratepayers concede that three are satisfied: jurisdiction is based solely on federal constitutional questions (due process and takings claims); the challenged order affects only Mississippi; and Mississippi courts provide a remedy for "[a]ny party aggrieved by any final finding, order or judgment of the commission in any utility rate proceedings," Miss. Code Ann. § 77-3-72(1).

So federal jurisdiction depends on the Johnson Act's third criteria: whether the Commission's 2015 order approving the refund plan was made "after reasonable notice and hearing." 28 U.S.C. § 1342(3). This requirement recognizes a greater justification for federal review of ratemaking when state agency procedures lack the basic hallmarks of due process. *See Nucor Corp. v. Neb. Pub. Power Dist.*, 891 F.2d 1343, 1348 (8th Cir. 1989) (recognizing that the Act's process requirement "had been interpreted as requiring that the minimum standards of due process be met.").

Notice is reasonable "if it is transmitted in a manner which, at a minimum, has a reasonable certainty of resulting in actual notice." *Id.* This is a fact-specific standard with little caselaw providing on-point help. The notice factor is a close call, but we ultimately agree with the district court that the 2015 refund order was not issued after "reasonable" process.

Mississippi Power and the Commission did not notify ratepayers of the 2015 refund proceedings. The Commission only notified the six parties who intervened in the 2013 rate increase proceeding before it approved the utility's 2015 refund proposal. *In re Notice of Intent of Miss. Power Co. for a Change in Rates Related to the Kemper Cnty. IGCC Project*, 2015 WL 4880634, at *1 (Miss. P.S.C. Aug. 6, 2015). It gave those parties a week to respond or

No. 21-60130

object. *Id.* The utility and the Commission did not provide similar notice to nonparty customers like the plaintiffs.

It does not matter that the ratepayers could have sought leave to intervene in the refund proceedings. The Johnson Act imposes no such requirement on customers; it places the burden of notice on the utility. The utility further points to its "extensive public notice campaign" publicizing the details of the refund plan. This is also irrelevant because the Johnson Act requires *prior* notice—after all, only that enables a timely objection—and the public education campaign occurred after the Commission issued the refund order. *See* 28 U.S.C. § 1342(3).

Given the absence of process specific to the 2015 refund order, Mississippi Power relies on the process it provided in the initial 2013 ratemaking. The utility maintains that its 2013 notice met state law requirements for all the subsequent hearings and that its compliance should be *per se* reasonable. Before it raised its rates in 2013, Mississippi Power mailed notice of the proposed rate increase to affected customers, published a notice in the *Clarion Ledger*, and notified all parties of record in the last proceeding in which the company sought a major rate change, *In re Notice of Intent of Miss. Power Co. for a Change in Rates Related to the Kemper Cnty. IGCC Project*, 2013 WL 871246, at *2 (Miss. P.S.C. Mar. 5, 2013). The Commission then held a public hearing on the rate increase, at which it allowed six intervenors to participate by submitting prewritten testimony, presenting their own evidence, and cross-examining all witnesses. *Id.* at *2–3.[5] State law did not require the utility to provide any additional notice to

---

[5] The district court concluded that the 2013 process was not reasonable, finding that the state supreme court's prior determination to that effect was preclusive. This was an error because the supreme court's holding did not relate to the 2013 order approving the rate increase but to a prior proceeding approving construction of the new plant. *See Miss.*

11

ratepayers before the refund proceeding two years later because it was considered part of the same matter. *See* Miss. Code Ann. § 77-3-39 (contemplating refunds following judicial invalidation of rate orders but requiring notice and hearing only upon utility's initial filing of notice of intent to change rates).

In the context of a refund hearing to remedy an illegal rate, Mississippi Power's compliance with state law was not enough to satisfy the Johnson Act's reasonable process requirement. One court of appeals has held that giving notice in the form required by state law satisfies the Johnson Act. *Brooks v. Sulphur Springs Valley Elec. Co-op*, 951 F.2d 1050, 1054 (9th Cir. 1991). *But see Nucor Corp.*, 891 F.2d at 1348 (rejecting idea that compliance with state law is a safe harbor). But no federal court has held that state law controls when Johnson Act notice is due in the first place. And we have explained that it is the court's duty to define reasonable process. *City of Meridian v. Miss. Valley Gas. Co.*, 214 F.2d 525, 526 (5th Cir. 1954) (finding it "plain" that the court, not the ratemaking body, defines reasonableness under the Johnson Act).

Understanding that the Johnson Act's procedural requirements reflect due process principles, *Nucor Corp.*, 891 F.2d at 1348, we do not see how notice of the 2013 rate hearing gave ratepayers meaningful notice of the refund hearing two years later. The Johnson Act's requirement of both "notice and hearing," seemingly ties one component of process to the other. After all, the right to be heard "has little reality or worth unless one is informed that the matter is pending." *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950). And requiring notice for both a rate hike

---

*Power Co.*, 168 So. 3d at 914–15. The state court opinion recognizes that the ratepayers *did* receive notice of the rate increase in 2013. *Id.* at 914 ("Ratepayers first received notice of MPC's intent to increase rates after entry of the April 24, 2012, Order . . .").

Case: 23-60130 Document: 00516348141 Page: 13 Date Filed: 06/08/2022
Case 3:18-cv-00085-CWR-FKB Document 76 Filed 06/09/22 Page 13 of 18

No. 21-60130

hearing and a refund hearing held years later is consistent with due process law in other areas. *Cf. Cleveland Bd. of Ed. v. Loudermill*, 470 U.S. 532, 546–47 (1985) (requiring notice of both pre- and post-deprivation hearings in challenge to termination of public employment).

To be sure, a hypervigilant customer could have followed the full history of the rate increase as it wound its way through the state agency and state courts only to end up back in a 2015 agency hearing to determine the amount of the refund. But it is not reasonable to expect that level of diligence from a utility customer not following administrative and court dockets as a lawyer might. As reasonableness is the touchstone of the Johnson Act's notice requirement, independent notice had to be provided for the 2015 refund hearing in order to insulate it from federal court scrutiny.[6] Because such notice was not provided, this case is properly in federal court.

### III.

With the jurisdictional questions decided, we turn to Mississippi Power's substantive dismissal motion. Mississippi Power contends that the ratepayers' federal claims are time-barred. Failure to file within the statute of limitations justifies dismissal under Rule of Civil Procedure 12(b)(6) when "it is evident from the plaintiff's pleadings that the action is barred and the pleadings fail to raise some basis for tolling or the like." *Jones v. Alcoa, Inc.*, 339 F.3d 359, 366 (5th Cir. 2003). But the timeliness of a claim can depend on evidence obtained in discovery or even require a factfinder to resolve disputed issues. *See Margolies v. Deason*, 464 F.3d 547, 554–55 (5th Cir.

---

[6] We do not hold that every separate rate hearing requires separate notice to satisfy the third Johnson Act element. But here the hearings occurred two years apart and addressed substantially different questions. A ratepayer who received notice in 2013 of a possible rate hike might not have desired to comment on that common occurrence but might have been quite interested in commenting on the refund for an illegal rate.

Case: 23-60130 Document: 00516348141 Page: 13 Date Filed: 06/08/2022
Case 3:18-cv-00085-CWR-FKB Document 76 Filed 06/09/22 Page 13 of 18

13

2006). We review dismissal for failure to state a claim *de novo*. *Raj*, 714 F.3d at 329–30.

In Mississippi, the limitations period for section 1983 claims is three years. *Cuvillier v. Taylor*, 503 F.3d 397, 401–02 (5th Cir. 2007) (incorporating Miss. Code Ann. § 15-1-49, Mississippi's general personal injury limitations period). The ratepayers filed this action on November 21, 2018, so their federal claims are timely if they accrued on or after that date in 2015.

Although state law provides the limitations period for a section 1983 claim, federal law determines when the claim accrues. *Wallace v. Kato*, 549 U.S. 384, 388 (2007). A claim accrues when the would-be plaintiff "knows or has reason to know . . . that he has been hurt and who has inflicted the injury." *Gartrell v. Gaylor*, 981 F.2d 254, 257 (5th Cir. 1993) (per curiam) (quotation omitted). Plaintiffs have reason to know of their cause of action when they have "notice of facts which, in the exercise of due diligence, would have led to actual knowledge" of injury and causation. *Roe v. United States*, 839 F. App'x 836, 843 (5th Cir. 2020) (quotation omitted). If plaintiffs have access to facts that they do not understand themselves, due diligence can require them to "seek professional advice" about their potential claims. *Harrison v. United States*, 708 F.2d 1023, 1027 (5th Cir. 1983). In short, the limitations period begins when "the circumstances would lead a reasonable person to investigate further." *Piotrowski v. City of Houston*, 51 F.3d 512, 516 (5th Cir. 1995).

Recall that the ratepayers' claims challenge the interest calculation used in determining their refunds. The district court concluded these claims accrued on August 6, 2015, when the Commission approved the refund plan proposed by Mississippi Power. The plan's main text does not mention interest or explain how interest would be calculated on the refunds, but a footnote—at the end of a sentence detailing the amount the utility collected

No. 21-60130

unlawfully—clarifies that "carrying costs . . . will be calculated using the 2015 cost of capital filed in the Company's 2015 ECO filing, adjusted for income taxes, *with annual compounding of interest*." From this, the district court concluded, a reasonable person would have sought professional advice to confirm that the plan provided for lawful interest.

Even assuming that the ratepayers had access to the refund plan on the day the Commission approved it, the plan's language did not put them on notice of facts that would cause a reasonable person to further investigate the interest issue. The footnoted sentence is not about interest; it merely catalogues the total amount of money that Mississippi Power collected under the faulty rate order.[7] The footnote is not obviously about interest either; it explains how the utility intended to calculate "carrying costs," or the costs a business incurs to hold stock inventory. *See* Will Kenton, *Carrying Costs*, INVESTOPEDIA (2020), https://www.investopedia.com/terms/c/carrying-costs.asp (defining carrying costs). Nowhere does the plan say what the interest rate is or the method of calculating it. And, of course, the plan does not tell ratepayers the amount of individual refunds. It is asking a lot of a reasonable person to recognize from the plan's obtuse and technical references that it uses a method to calculate interest different from the one required by law. The ratepayers' claims did not accrue on August 6, 2015.[8]

---

[7] In full, the above-the-line sentence preceding the footnote reads: "As of June 30, 2015, [Mississippi Power] had collected approximately $331 million pursuant to the Mirror CWIP Order and accrued an additional $22 million of carrying costs."

[8] The district court also noted that the ratepayers actually did retain an expert to advise them on the interest calculation issue sometime before November 2015. When a plaintiff has actual knowledge of causation and injury, it is unnecessary to consider what a "reasonable person" would know. *See Smith v. Reg'l Transit Auth.*, 827 F.3d 412, 421 (5th Cir. 2016). But the record does not reflect who hired Cohen or when. And while those who retained Cohen developed actual knowledge of their injury at some point, we do not know when Cohen first realized they were underpaid.

Case: 21-60130    Document: 00516348141    Page: 16    Date Filed: 06/08/2022
Case 3:18-cv-00008-CWR-FKB    Document 76    Filed 06/09/22    Page 16 of 22

No. 21-60130

Nor did their claims accrue on August 16, 2016, when Cohen issued his report finding that Mississippi Power miscalculated interest on the refunds. Using this late date is at odds with the accrual standard. Our cases ask when a would-be plaintiff should seek professional advice, not when they actually receive it. *See Harrison*, 708 F.2d at 1027. To hold otherwise would allow litigants to evade the statute of limitations by delaying expert opinions for months or even years.

Other possible accrual dates remain. One possibility is that the claims accrued when Mississippi Power explained on the FAQ page of its website that it would pay interest at its "after tax WACC (weighted average cost of capital) rate of 9.5% . . . over the entire refund period (March 2013 – July 2015) and up to Nov. 7 when we begin issuing the refunds."[9] The interest described in the FAQ differs from the interest guaranteed by statute in several aspects. For one, the FAQ promises 9.5% interest rather than the 8% guaranteed by law. *See* Miss. Code Ann. § 75-17-1. Additionally, the FAQ indicates that Mississippi Power intended to calculate interest "over the entire refund period" rather than "per annum" and "according to the actuarial method," as the statute requires. *See id.* These discrepancies, combined with the fact that the FAQ (unlike the refund plan footnote) explicitly mentions interest, may have led a reasonable person to "investigate further." *Piotrowski*, 51 F.3d at 516.

It could be, however, that the ratepayers could not have ascertained their injury from the FAQ, because it was not clear at that time that they would be underpaid. Cohen calculated that, compounded annually, Mississippi Power would have owed customers $40.7 million in interest at

---

[9] We do not know the exact date that Mississippi Power published the FAQ. It was certainly posted by November 1, 2015, when Cohen accessed it online.

the statutory rate and $48.2 million in interest at the 9.5% WACC rate. Either method would result in a payout higher than the $30 million that Mississippi Power's FAQ anticipated the company would pay in total interest. Further complicating the calculation, it is not clear whether Mississippi Power would compound interest annually, as alluded to in the plan footnote, or "over the entire refund period," as stated in the FAQ, a distinction that could be the difference between overpayment and underpayment.

Another possibility is that the ratepayers' claims accrued upon the receipt of their refunds. Citing cases from the tax refund context, the ratepayers contend that an underpayment-based injury cannot occur until the injured party receives their deficient check, because before that point, the government could alter the amount to be refunded. *See, e.g.*, *United States v. Wurts*, 303 U.S. 414, 417 (1938) (concluding that IRS's wrongful refund claim accrued when a taxpayer received the erroneous refund, not when the IRS Commissioner approved it). On this theory, only some of the ratepayers would be barred from suing. Mississippi Power issued refund checks in seven batches between November 6 and December 4, 2015. Only those ratepayers who received their checks after November 21st could continue this action. It is unclear from the record if any of the named plaintiffs fall into the latter category.[10]

The ratepayers' claims did not accrue on August 6, 2015, when the Commission approved the refund plan, or on August 16, 2016, when Cohen concluded that Mississippi Power shorted them. Given the uncertainties in the record that we have noted, and the possible benefit of limited discovery on the limitations issue, we remand for the district court to decide in the first

---

[10] Some ratepayers received their refunds as a credit on their utility bills instead of a check. We do not know if any named plaintiffs chose the credit option, and if so, when that credit was posted to their accounts.

17

instance which of the remaining options outlined above is the correct accrual date.[11]

* * *

We AFFIRM the dismissal of the claims against the Commissioners but VACATE the district court's dismissal of the claims against Mississippi Power on limitations grounds. We REMAND for further proceedings consistent with this opinion.

---

[11] It may be, however, that the district court need not reach the limitations issue. Mississippi Power raised two additional arguments for dismissal: first, that it is not a state actor subject to suit under section 1983, and second, that the ratepayers do not have a property interest in the refund protected by the Due Process Clause. Mississippi Power asks us to affirm on those alternative grounds, but the district court should consider those issues in the first instance. We do not intimate what decisions it should reach on those questions.